## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and** | ) | |
| **PEOPLE OF THE VIRGIN ISLANDS** | ) | |
| | ) | **Criminal Action No. 2016-0011** |
| **v.** | ) | |
| | ) | |
| **LEON NISBETT,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
     *For the Government*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
*For Defendant*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Leon Nisbett's "Motion to Suppress Statements and Physical Evidence" (Dkt. No. 10), the Government's Opposition thereto (Dkt. No. 12), and the evidence and oral arguments presented at a suppression hearing. The Government also filed a Notice (Dkt. No. 45), informing the Court that it would not seek to re-open the hearing to provide any further evidence in response to Defendant's request to suppress DNA evidence, and Defendant filed a Reply (Dkt. No. 56). In addition, the Government filed an Opposition with additional legal authority pertaining to the request to suppress Defendant's name and identity. (Dkt. No. 46).

For the reasons discussed below, the Court will grant in part and deny it in part the Motion to Suppress. Specifically, the Court will grant Defendant's Motion as it relates to the firearm,

ammunition, Defendant's statements made after the pat-down, and the DNA sample, and will deny Defendant's Motion as it relates to his name, identity, and statements made by Defendant prior to the pat-down.

## I.    BACKGROUND AND EVIDENCE

Defendant Leon Nisbett ("Defendant") was indicted on May 26, 2016 on the following two counts: (1) Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (2) Unauthorized Possession of a Firearm in violation of 14 V.I.C. § 2253(a). (Dkt. No. 1).

At the suppression hearing, Virgin Islands Police Department Sergeant Patricia Stevens and Officers Cuthbert Cyril and Teaclla Buckley testified, and the Government entered one exhibit—a photograph of the gun allegedly recovered from Defendant on the morning in question. The following facts have emerged from the record before the Court.[1]

At approximately 6:00 a.m. on December 12, 2015, Sgt. Patricia Stevens of the Virgin Islands Police Department ("VIPD") observed a vehicle stopped on the Melvin Evans Highway. The vehicle was stopped in the passing lane of the highway with the engine running and the lights on. Sgt. Stevens stopped about one car length behind the vehicle. Concerned for her safety and unable to determine if the vehicle had any occupants due to heavy tint on the windows of the car, she attempted to make contact with the driver from a distance. She illuminated every available light on her marked police car, called out to the driver several times using her PA system, and activated her air horn, but there was no response from the vehicle. After her efforts received no response, she drew her weapon, pointing it at a forty-five-degree angle, and took cover behind the

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Nisbett is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

driver's door of her vehicle. She called for, and obtained, backup. Officer Teaclla Buckley stopped at the scene on her way into work in her personal vehicle about ten minutes after Sgt. Stevens first arrived at the scene, and Officer Cuthbert Cyril arrived shortly thereafter from the Sunny Isles area where he had been patrolling.

All three officers approached the car—the two female officers approaching the driver's side and Officer Cyril approaching the passenger's side. Officer Cyril observed Defendant reclined in the driver's seat. All three officers testified that the officers knocked on the windows, pounded on the roof, and called out to the driver, but to no avail. Officer Cyril and Sgt. Stevens both testified that, at this point, they were concerned that the occupant of the vehicle was in medical distress, or perhaps even dead. Officer Cyril walked around, opened the driver's door, called out to the driver loudly and even shook Defendant, but was unable to rouse Defendant until the second time that he shook him by the shoulder. Sgt. Stevens and Officer Cyril testified that Defendant appeared confused and did not know that he had stopped in the passing lane of the highway. Officer Cyril inquired if Defendant was alright, to which he responded "yeah." Defendant responded "no" in response to officers' inquiries as to whether he knew where he was. The officers then asked Defendant to exit the vehicle. Officer Cyril assisted Defendant out of the vehicle and led Defendant by the arm to the rear of the vehicle, out of the way of oncoming traffic. Officer Cyril testified that this was necessary because Defendant "did not appear to be stable."

All three responding officers testified that they had their weapons drawn at some point during the stop. Officer Cyril testified that his weapon was drawn and held at a forty-five-degree angle when he approached the vehicle, but was re-holstered by the time he led Defendant to the rear of the vehicle. Although it is unclear at what precise point any of the officers re-holstered their weapons, testimony established that all of the officers had their weapons holstered by the time that Defendant became responsive.

3

Officer Buckley and Sgt. Stevens testified that, at the point that Officer Cyril was assisting Defendant out and leading him to the rear of the vehicle, they detected the smell of marijuana coming from the car. Officer Cyril testified that he smelled alcohol when he got very close to Defendant, but reported no other odors. Although testimony of the officers was not entirely clear on the sequence of events here, their testimony, taken together, established that, at this point Officer Cyril patted-down Defendant at the direction of Sgt. Stevens, while the other two Officers conducted a search of the vehicle.  Sgt. Stevens testified that her motivation in searching the vehicle was to discover contraband, and the purpose of patting down Defendant was for officer safety. No contraband was found in the vehicle, although empty vials were found.

Officer Cyril testified that he patted down Defendant, with Defendant up against the trunk of his vehicle and his hands placed on the trunk. Officer Cyril felt a gun in Defendant's right rear pants pocket. After discovering the weapon, he shouted "GUN!" to alert the other officers, who ceased searching the car and joined him at the rear of the vehicle. Officer Cyril gave the weapon to Officer Buckley, who secured it in Sgt. Stevens' vehicle. Officer Cyril handcuffed Defendant and then Officer Buckley questioned him on the highway regarding whether he possessed a valid firearms license. Defendant stated in response: "No, it's not mine anyway."

Defendant was taken to the Anselmo Marshall Command Police Station, where a firearms license check was performed, and no such license was found for Defendant. The desk clerk cleared the weapon, which was found to contain seven rounds of ammunition. Sgt. Stevens testified that, after no firearms license was found for Defendant, he was formally placed under arrest and advised of his rights for the first time since Sgt. Stevens initiated the encounter. At the station, Defendant was processed, booked, and taken to Golden Grove. (Dkt. No. 10 at 3). He gave a DNA sample, but declined to make a statement. (*Id.*).

4

## II.   DISCUSSION

In the instant motion, Defendant seeks to suppress "[a]ll physical evidence, to include a gun and ammunition, DNA evidence collected after Mr. Nisbett's arrest, and statements taken or illegally flowing from the illegal search and seizure." (Dkt. No.10 at 1). Defendant argues that he was seized and illegally detained on December 12, 2015 during the traffic "stop" which took place on the eastbound side of Melvin Evans Highway. (Dkt. No. 10 at 4). Defendant asserts that he was seized the moment officers drew their weapons and ordered him out of the car, without any facts at that time indicating to the officers that criminal activity was occurring. (Dkt. No. 10 at 5). Defendant further asserts that his statements to the officers "should also be suppressed because they were obtained in violation of *Miranda*." (Dkt. No. 10 at 4).

In its Opposition, the Government asserts that there was no Fourth Amendment violation in this case and that the physical evidence and statements of Defendant should not be suppressed. (Dkt. No. 12 at 4). Specifically, the Government argues that because "the defendant's car was essentially parked in the passing lane of the Melvin Evans Highway" the "stop" of Defendant's car was legitimate based on either the reasonable suspicion of criminal activity or a technical violation of the traffic code. (*Id.* at 5-6). Further, the Government argues that the officers were justified in entering the vehicle under the emergency exception due to Defendant's unresponsiveness and unconsciousness. (*Id.* at 6-10). The Government asserts that the officers acted reasonably during the duration of the stop, and had probable cause to search Defendant's vehicle as a result of VIPD officers detecting the smell of marijuana. (*Id.* at 10-13).

### A.  Initial Stop, Defendant's Exit from Vehicle, and Extension of Stop

At the suppression hearing, Defendant argued that, in order for the stop to be lawful, there must be a specific law which Defendant was violating by parking in the passing lane of the highway. The Government did not cite to any specific code section, and instead argued that

5

Defendant was impeding traffic, and officers were justified in investigating the vehicle stopped on the highway. From its filing, the Government's argument appears to rest on a violation of traffic laws based on Defendant stopping in the passing lane of a highway. (Dkt. No. 12 at 5-6). The Government did not articulate a reason, either in its filing or at the hearing, for the officers ordering Defendant out of the vehicle, and asserts that the Government need not have such a reason, citing *Arizona v. Johnson*, 555 U.S. 323 (2009) and *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977).

### 1.   Applicable Legal Standards

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV; *see also* 48 U.S.C. § 1561 ("The right to be secure against unreasonable searches and seizures shall not be violated."). "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)).

"[U]nder the exception to the warrant requirement established in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court has held that 'police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause.'" *United States v. Mathurin*, 561 F.3d 170, 173-74 (3d Cir. 2009) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In *United States v. Hensley*, 469 U.S. 221 (1985), the Supreme Court explained that the suspected criminal activity need not be in process. Police may use a "*Terry* stop" to investigate reasonable suspicion that an individual "was involved in or is wanted in connection with a completed felony." *Id.* at 227-28; *United States v. Brown*, 448 F.3d 239, 244 n.7 (3d Cir. 2006) ("The *Terry* analysis applies here even though the crime in question had already been completed.").

In evaluating reasonable suspicion, courts "must consider 'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

The Third Circuit has found that "the *Terry* reasonable suspicion standard applies to routine traffic stops" based on suspected traffic offenses. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006). In other words, as the Supreme Court has found, "in a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Johnson*, 555 U.S. at 327. When determining whether an officer possessed reasonable suspicion to conduct a traffic stop, the totality of the circumstances must be considered. *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012). "[A]n officer's Fourth Amendment burden of production is to (1) identify the ordinance or statute that he believed had been violated, and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction." *Delfin-Colina*, 464 F.3d at 399. An officer's reasonable, mistaken factual belief that a traffic violation has occurred is sufficient to justify the seizure of a vehicle. *Id.* at 398 ("In other words, an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place."). The Supreme Court has extended the reasonable mistake of fact exception to include reasonable mistakes of law. *Heien v. N. Carolina*, 135 S. Ct. 530, 536 (2014). The limit is that "the mistakes must be those of reasonable men." *Id.* (citing *Brinegar v. United States,* 338 U.S. 160, 176 (1949)).

The Third Circuit has recognized it as "settled law that a traffic stop is a seizure of everyone in the stopped vehicle." *United States v. Mosley*, 454 F.3d 249, 253 (3d Cir. 2006). "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 135

S. Ct. 1609, 1614 (2015). A routine traffic stop, which is "a relatively brief encounter" is, by comparison, "more analogous to a so-called '*Terry* stop' . . . than to a formal arrest." *Id.* (internal quotation and citation omitted). "Like a Terry-stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Id.* (internal quotation and citation omitted). Because a traffic stop may last no longer than is necessary for the purpose of the stop, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (internal quotation and citation omitted).

Where the officer has stopped a vehicle for a lawful reason, the police may order the occupants out of the vehicle without any kind of particularized suspicion. *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004); *Maryland v. Wilson,* 519 U.S. 408 (1997). This bright line rule is derived from the legitimate and weighty interest in officer safety, as contrasted with the *de minimis* intrusion on the vehicle occupants' personal freedom. *Mimms*, 434 U.S. at 110-11.

## 2.   Analysis

The legal standard for a traffic stop of a vehicle is the reasonable belief that a vehicular violation has occurred or is occurring. *Johnson*¸ 555 U.S. at 327. As the Supreme Court has stated, "the ultimate touchstone under the Fourth Amendment is 'reasonableness.'" *Heien*, 135 S. Ct. at 530 (quoting *Riley v. California*, 134 S. Ct. 2473, 2484 (2014)). As it is reasonable for an officer to believe that remaining at a complete stop in a vehicle—seemingly parked—in the passing lane of the highway, absent some extenuating circumstance, is a violation of the traffic laws, the Court finds that there was reasonable suspicion to effect a traffic stop. *See Smith v. Ball State Univ.*, 295 F.3d 763, 768 (7th Cir. 2002) (holding that officers had reasonable suspicion to stop vehicle where officers "received a police dispatch stating that a vehicle had veered off the street and had come to rest on a campus sidewalk" and when they arrived, found the vehicle running and stopped on the

sidewalk and an unresponsive individual in the driver's seat). Therefore, the Court concludes that the officer's belief that Defendant was committing a traffic violation was reasonable, even if mistaken, and the traffic stop did not violate the Fourth Amendment. *See Johnson*¸ 555 U.S. at 327; *Johnson*¸ 63 F.3d 242.[2]

It was also lawful for the officers to order that Defendant exit the vehicle as part of the traffic stop. The Supreme Court has made clear that it is a lawful, *de minimis* intrusion for officers to order that vehicle occupants exit a vehicle as part of a lawful traffic stop. *Wilson,* 519 U.S. 408; *Mimms*, 434 U.S. 106. Thus, the officers were legally authorized to order Defendant to exit the vehicle, and to direct him to the rear of the vehicle in order to place all parties involved in a safer position. *Mimms*, 434 U.S. at 111. Further, the smell of marijuana detected by Officers Stevens and Buckley then justified the extension of the stop beyond the initial investigation of the stopped vehicle. *See United States v. Frierson*, 611 F. App'x 82, 85 (3d Cir. 2015) (holding than an officer may "expand the scope of a traffic stop and detain the vehicle and its occupants for further

---

[2] The parties disagree as to the precise moment when Defendant was seized. Defendant argued at the hearing that he was seized the moment that the officers drew their weapons and ordered him out of the car, (Dkt. No. 10 at 5), or alternatively, at least when the officers approached the window, citing *Johnson v. Campbell*, 332 F.3d 199 (3d. Cir. 2003). The Government countered that an unconscious individual cannot be seized, and therefore, the moment of seizure did not occur until Defendant was roused.  Several courts have weighed the question of whether an unconscious individual can be seized, and concluded that an objective analysis is appropriate: unconsciousness precludes a finding that the allegedly seized individual submitted to the show of authority, and therefore an officer's actions do not rise to the level of a seizure. *Vargas v. City of Philadelphia*, 2013 WL 6077160, at *7 (E.D. Pa. Nov. 18, 2013), *aff'd on other grounds*, 783 F.3d 962 (3d Cir. 2015) (discussing *Peete v. Metro. Gov't of Nashville & Davidson Cty.*, 486 F.3d 217 (6th Cir. 2007) and *Leaf v. Shelnutt*, 400 F.3d 1070 (7th Cir. 2005).

It is settled that a traffic stop effects a seizure of the vehicle's occupants. *Mosley*, 454 F.3d at 253. Whether the seizure occurred at the inception of the traffic stop, or only after Defendant was roused from his seemingly unconscious state, is of no consequence because the period between the stop and Defendant becoming responsive has no bearing on the evidence sought to be suppressed. Thus, the Court does not need to address or resolve the question regarding the precise moment of seizure.

investigation if he 'develops a reasonable, articulable suspicion of criminal activity.'") (quoting *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)).

In view of the foregoing, the Court finds that the initial stop of the vehicle, the ordering of Defendant to exit the vehicle, and the extension of the traffic stop beyond its initial mission once the officers smelled marijuana did not violate the Fourth Amendment.

### B.   Opening of Defendant's Car Door

The Government argues that the officers were justified in entering the car under the "emergency exception," as articulated in *United States v. Coleman*, 2011 WL 2619543, at *1 (D.N.J. July 1, 2011), *aff'd*, 545 F. App'x 156 (3d Cir. 2013). The Government argues that the officers sought to render aid to Defendant, as they thought he was in serious medical condition, or perhaps even dead. Given that Defendant was parked in the passing lane of a highway, as opposed to in an apartment complex like *Coleman*, the Government asserts that this is an even more compelling case than *Coleman* for the application of the emergency exception. Defendant offered no counterargument, either at the hearing or in his filings.

### 1.   Applicable Legal Standards

In *Coleman*, two officers approached a stationary vehicle that had its headlights on, engine running, radio blaring, and an unconscious individual in the driver's seat. *Id.* at *3. After attempting to rouse him by shouting and banging on the windows, the officers entered the vehicle for what the court determined to be an "emergency purpose." *Id.* at 3-4. The court concluded that because the occupant of the vehicle was not moving, officers were justified in entering in order to provide assistance. *Id.* As entry was justified, the weapon that the officers found in plain view in the course of attempting to render assistance was permitted to be introduced at trial. *Id.* at 4. That court relied on cases discussing the exigent circumstances exception to the warrant requirement in order to reach its conclusion. *Id.* at 3.

The Government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is "heavy." *United States v. Mallory*, 765 F.3d 373, 383–84 (3d Cir. 2014) (citing *Welsh v. Wisconsin,* 466 U.S. 740, 749–50 (1984)). If the Government carries that burden, "the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey v. Arizona,* 437 U.S. 385, 393 (1978). This would ostensibly include "plain smell," as an extension of the plain view doctrine, although plain smell has not yet been examined by this Circuit in a precedential opinion. *United States v. Yamba*, 506 F.3d 251, 257 n.4 (3d Cir. 2007); *see United States v. Charles*, 29 F. App'x 892, 898 (3d Cir. 2002).

 "[T]he exigencies of the situation [may] make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Mincey,* 437 U.S. at 393–394). For example, "police may make warrantless entries onto premises if they reasonably believe a person is in need of immediate aid." *Flippo v. W. Virginia*, 528 U.S. 11, 14 (1999) (citing *Mincey*, 437 U.S. at 392).  The exception may be invoked where it is "reasonable to believe [an individual has] hurt himself" and requires treatment he is unable to provide in present circumstances, or that he is "about to hurt, or had already hurt, someone else." *Fisher*, 558 U.S. at 47.

The presence of exigent circumstances is determined "by reviewing the facts and reasonably discoverable information available to the officers at the time they took their actions" and by considering "the totality of the circumstances facing them." *Estate of Smith v. Marasco,* 318 F.3d 497, 518 (3d Cir.2003). In conducting this analysis, "[t]he officer's subjective motivation is irrelevant."  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006). The test is "whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Fisher*, 558 U.S. at 49; *Brigham City,* 547 U.S. at 406; *Mincey,* 437 U.S. at 392.

## 2.  Analysis

In the instant matter, the officers were presented with a non-responsive individual whose vehicle was stopped in the passing lane of the highway with the engine running and lights on. He was not moving and did not respond to lights, voices (even amplified and shouting), or pounding on the vehicle. Given the totality of the circumstances facing the officers, it was reasonable for them to conclude that exigent circumstances (*i.e.*, a medical emergency) existed warranting their entry into Defendant's vehicle. *Marasco,* 318 F.3d at 518. Accordingly, the Court finds that the opening of Defendant's car door did not constitute a violation of the Fourth Amendment.

### C.  Statements Made by Defendant in Vehicle

Defendant argues that all of the statements he made to officers on the Melvin Evans Highway, from the outset of the encounter, should be suppressed under *Miranda*. According to the testimony of Sgt. Stevens, Defendant responded "yeah" when asked by officers if he was alright, and "no" in response to the officer's inquiry as to whether he knew where he was when the officers first communicated with him after he became responsive. The Government concedes that Defendant was not advised of his rights until he was taken to the station, which occurred after the roadside questioning. (Dkt. No. 12 at 3). However, the Government contends that Defendant was never arrested at the scene, and at no point prior to his formal arrest was he restrained to a degree associated with a formal arrest so as to require *Miranda* warnings. Further, the Government argues that the initial series of responses Defendant gave prior to exiting the vehicle were obtained in the course of seeking to provide assistance to Defendant, and should not, therefore, be suppressed.

### 1.  Applicable Legal Standards

In *Miranda v. Arizona*, the Supreme Court established the now well-recognized legal principle that under the Fifth Amendment the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it

demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). *Miranda* warnings are required when a suspect is "(1) 'in custody' and (2) subject to 'interrogation' by the [g]overnment." *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (citations omitted). An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

A suspect is "in custody" when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). "This determination is objective, based on 'how a reasonable man in the suspect's position would have understood his situation.'" *United States v. May*, 87 F. App'x 223, 226-27 (3d Cir. 2003) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.'" *United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006) (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)).

The Supreme Court has held that in a typical traffic stop scenario, police do not need to administer *Miranda* warnings to every motorist they detain. *Berkemer*, 468 U.S. at 438-441. Ordinary traffic stops are considered less coercive than the types of interrogation at issue in *Miranda*. *Id.* at 440. However, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.*

### 2.  Analysis

As the Government points out, *Berkemer* held that "the usual traffic stop is more analogous to a so-called 'Terry stop'" than a formal arrest. 468 U.S. at 439. Based on testimony from the hearing, the Court concludes that the initial series of questions occurred within the context of a traffic stop which, at that point, was focused on rendering aid to the occupant of the vehicle, and thus did not have the trappings of a custodial environment. The questions asked by the officers were precipitated by the unresponsive state in which Defendant was found, and the need to determine whether medical or other assistance was necessary. Thus, the questions could not reasonably be considered to have been designed to evoke a confession nor could they foreseeably elicit an inculpatory response. *Bonner*, 469 F. App'x at 126. Accordingly, the Court concludes that Defendant was neither "in custody" nor the subject of "interrogation" so as to require *Miranda* warnings, and therefore, Defendant's Motion to Suppress will be denied with respect to those statements made while he was seated in the vehicle.

### D.  Pat-down of Defendant

Defendant argued at the hearing that the officers had no articulable reasonable suspicion that would justify a pat-down. According to Defendant, he was compliant with the officers' requests (once he became responsive), and the officers themselves testified that their guns were holstered by this point in the encounter. Defendant further argues that, if the purpose of the stop was to render emergency assistance to him, a search of his person—even if for the protection of the officers—extends beyond the original purpose of the stop, thus requiring the officers to articulate an independent justification for the pat-down. Defendant argues that, accepting the Government's argument would condone a rule that a frisk is always justified incident to a "*Terry*-like" traffic stop.

The Government concedes that there must be an articulable reasonable suspicion that an individual is armed and presently dangerous in order to perform a pat-down. (Dkt. No. 12 at 11). The Government infers such suspicion from the totality of the circumstances, beginning with Sgt. Stevens' initial response of drawing her service weapon due to the fact that she did not know what she could expect with this particular stop. Further, the Government points to the fact that Defendant was practically impossible to awaken and smelled of alcohol, and his vehicle smelled of marijuana. It would have been imprudent, the Government asserts, for officers not to pat-down Defendant.

### 1.   Applicable Legal Standards

As previously noted, a *Terry* stop is justified when an officer has a reasonable suspicion that "criminal activity may be afoot." *United States v. Kithcart*, 134 F.3d 529, 532 (3d Cir. 1998) (quoting *Terry v. Ohio,* 392 U.S. 1, 30 (1968)). In a traffic stop scenario—as here—the police may pat-down an individual for weapons if the officer reasonably believes the individual "might be armed and presently dangerous." *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977); *see also Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *Kithcart*, 134 F.3d at 532. The requirement that officers reasonably believe an individual to be armed and presently dangerous exists because of the personal liberty interest individuals have in their person. The Supreme Court has observed that there exists a "unique, significantly heightened protection afforded against searches of one's person." *Wyoming v. Houghton*, 526 U.S. 295, 303 (1999). "Even a limited search of the outer clothing ... constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry*, 392 U.S. at 24-25.

The test is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Kithcart*, 134 F.3d at 532 (quoting *Terry*, 392 U.S. at 21). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth

Amendment only requires that police articulate some minimal, objective justification." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (citing *United States v. Sokolow,* 490 U.S. 1, 13 (1989)) (discussing reasonable suspicion in context of an investigatory stop).

By way of example, such a minimal justification for a pat-down has been found where a suspect makes "furtive hand movements," refuses to obey officer's orders, and makes movements consistent with attempting to conceal something. *United States v. Calloway*, 571 F. App'x 131, 136–37 (3d Cir. 2014). A suspect's violent history and suspicion that he is engaged in drug trafficking has also been held to constitute reasonable suspicion. *United States v. Frierson*, 611 F. App'x 82, 86 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 1159 (2016). Further, a suspect's appearance, specifically a loose long sleeve shirt extending below the waist, has been considered to support an officer's reasonable suspicion and justify a pat-down. *Id.*

### 2.   Analysis

Tellingly, the Government's Opposition does not cite to any legal authority for Officer Cyril's pat-down of Defendant. Instead, it relies on *Givan* for the proposition that after a lawful stop, if an officer develops a reasonable articulable suspicion of criminal activity, the officer "may extend the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *Givan*, 320 F.3d at 458; (Dkt. No. 12 at 11-12). However, such further investigation must still comply with the Fourth Amendment. *Givan*, 320 F.3d at 458. For example, as the Third Circuit noted in *Givan*, reasonable articulable suspicion of criminal activity warranted extending the stop and asking for consent to search or to obtain a warrant. *Id.* The "minimal objective justification" that criminal activity may be occurring required for a stop does not necessarily, in and of itself, provide the officers with the right to begin searching the vehicle or patting down its occupants. At the hearing, the Government urged the Court to look at the totality of the circumstances to infer that the officers had a reasonable, articulable suspicion

that Defendant posed a threat to the safety of others in order to justify the pat-down.

Testimony showed that the officers were presented with an individual who was, at first, unquestionably unresponsive, and seemingly unconscious, seated in a stationary vehicle in a passing lane on a highway, with the engine running and lights on. Once he became responsive, the individual was groggy; provided short answers; and apparently required assistance to exit and walk to the rear of his vehicle because, as Officer Cyril testified, he "did not appear to be stable." However, the Government has pointed to no behavior or other indication from Defendant, or any other circumstances which suggest that the officers had any reasonable belief that their safety or that of others was in danger. *Kithcart*, 134 F.3d at 532. Once the officers ascertained that the sole occupant of the vehicle was an unresponsive, groggy male who required assistance to get out, and to walk to the rear, of the vehicle, there was no reason that a "reasonably prudent man in the circumstances" would believe Defendant posed any threat to the officers or anyone else. No subsequent occurrence pointed to by the Government, including the smell of marijuana in the vehicle or alcohol on Defendant's person, suggests—by itself—that the officers had a reasonable suspicion that Defendant was armed and dangerous. This conclusion is bolstered by the fact that none of the officers articulated the basis for such a suspicion at the hearing, leaving the Government with its attempts to supplement this dearth of evidence with an "inchoate and unparticularized suspicion" based on the totality of the circumstances. *Sokolow*, 490 U.S. at 8. ("The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or 'hunch.''"). Thus, contrary to the Government's contention, an analysis of the totality of the circumstances does not support its position.

As the Supreme Court stated in *Terry*, "[c]ertainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." 392 U.S. at 23. This Court does not suggest otherwise. The Court's ruling here rests squarely on the fact that there has

been no articulation by the officers nor any circumstances presented to the Court from which one can reasonably conclude that a pat-down of Defendant was warranted.

As there was no legal basis for the pat-down of Defendant, the firearm discovered during that search must be suppressed.

### E.  Derivative Evidence

Defendant argues that he was subject to an illegal stop, seizure, and investigation, and as a result all evidence obtained must be suppressed as fruit of the poisonous tree. (Dkt. No. 10). The Government maintains that the stop was lawful, and that any potential Constitutional violations which may have occurred in connection with a question regarding whether Defendant possessed a firearms license are rendered of no consequence by the inevitable discovery doctrine.

### 1.  Applicable Legal Standards

Evidence obtained as a result of a Fourth Amendment violation ordinarily must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *see also United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010); *United States v. Mosley*, 454 F.3d 249, 254 (3d Cir. 2006). Such "fruits" include physical evidence, *Mosley*, 454 F.3d at 269 (suppressing guns discovered pursuant to an illegal traffic stop), as well as "derivative evidence, both tangible and testimonial, acquired as a result of the unlawful search." *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). However, "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *United States v. Bowley*, 435 F.3d 426, 430 (3d Cir. 2006), *as amended* (Feb. 17, 2006) (quoting *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984)).

The Supreme Court has stated that "the scope of the exclusionary rule is determined by 'whether, granting establishment of the primary illegality, the evidence to which objection is made

has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002) (quoting *Wong Sun*, 371 U.S. at 488); *see United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir. 1999); *see also United States v. Goodrich*, 450 F.3d 552, 557 (3d Cir. 2006); *Mosley*, 454 F.3d at 269; *United States v. Perez*, 280 F.3d 318, 338 (3d Cir. 2002) ("[E]vidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint." (quoting *Segura v. United States*, 468 U.S. 796, 797 (1984) (internal quotation marks omitted)). To determine whether the taint of the initial illegality has been purged, the Supreme Court has instructed courts to consider three non-dispositive factors: (1) the temporal proximity between the unlawful conduct and the recovery of the evidence; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy" of the unlawfulness. *Brown*, 422 U.S. at 603-04. The Government bears the burden of establishing that "suppression is unwarranted in light of these factors." *United States v. Dupree*, 617 F.3d 724, 739 (3d Cir. 2010) (citing *Taylor v. Alabama*, 457 U.S. 687, 690 (1982)).

The doctrine of inevitable discovery applies "'if the prosecution can establish by a preponderance of the evidence that the [evidence] ultimately or inevitably would have been discovered by lawful means.'" *United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (quoting *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)). "The Government can meet its burden by establishing 'that the police, following routine procedures, would inevitably have uncovered the evidence.'" *Id.* (quoting *Vasquez*, 149 F.3d at 195). In other words, the Government must show that "the evidence would have been obtained inevitably, and therefore would have been admitted regardless of any overreaching by the police." *Nix v. Williams*, 467 U.S. 431, 444 (1984); *see Wrensford*, 2014 WL 3907021, at *11 (stating that the inevitable discovery doctrine could be used to cure the illegality of an officer's seizure of Defendant's keys, wallet and insurance card

19

during *Terry* frisk, but concluding that the Government failed to carry its burden of showing the existence of routine procedures that would have resulted in their inevitable discovery).

## 2.  Analysis

According to testimony at the suppression hearing, after the firearm was discovered, the following occurred: Defendant was handcuffed; questioned regarding the possession of a firearms license; and transported to the police station. Once at the station, a firearms check was performed; Defendant was formally placed under arrest and given *Miranda* warnings; the firearm was cleared and ammunition removed; Defendant was processed and booked; and he gave a DNA sample. Because the Court finds that the statement regarding the absence of a firearms license, the ammunition, and the DNA sample are all inextricably tied to the recovery of the firearm from the illegal pat-down, these items of evidence are fruits of the poisonous tree and will be suppressed.

As the Court has found, the discovery of the firearm resulted from an illegal search (pat-down). It was only because of that illegal search and resulting discovery that the firearms license question was posed, which elicited the negative response. *Wong Sun*, 371 U.S. at 485 ("verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion"). Further, it was the discovery of the gun from the illegal search and the negative response to the firearms license question that prompted the remaining actions which produced additional evidence.

The Government asserts that the officers had probable cause to arrest Defendant at the point that he informed them that he did not have a license for the firearm found in his possession. (Dkt. No. 12 at 12). However, since Defendant's statement regarding the absence of a firearms license was obtained in response to a question derived from the officer's discovery of the firearm, the statement is tied to that discovery. Further, because the discovery of the firearm is directly

derived from the illegal pat-down, the statement is a fruit of that illegal pat-down. In view of the fact that the evidence of probable cause for the arrest upon which the Government relies is tied to the illegal pat-down, the arrest is also unlawful. Because the arrest is unlawful, all information obtained as a result of Defendant's arrest—to wit, the ammunition and DNA evidence—must be suppressed as fruit of the poisonous tree. *See Mosley*, 454 F.3d at 251 (A Fourth Amendment violation by law enforcement at the outset of an encounter will result in exclusion of all evidence obtained during the interaction "unless the government can show that the taint of the [initial violation] was purged.").

The Government claims, in the alternative, that any illegality stemming from questioning Defendant about his possession of a firearms license would be overcome by the inevitable discovery of that information. However, the Government has failed to carry its burden to show that information regarding Defendant's license would have been inevitably discovered by lawful means. *Stabile*, 633 F.3d at 245. Although the fact that Defendant did not possess a firearms license was discovered at the station via a records check, the Government did not present testimony sufficient to establish that it is police policy to run such a check in these kinds of situations, thus precluding application of the inevitable discovery doctrine to the information regarding Defendant's lack of a firearms license. Sgt. Stevens testified that a license check was performed at the station. However, the Government proffered no testimony or evidence regarding routine procedures, instead relying on a conclusory statement at the hearing that Defendant's license status would have been inevitably discovered. *Id.* (government must show, by a preponderance of the evidence, that evidence in question would have been uncovered absent illegal conduct in order to

invoke the inevitable discovery exception). This bald assertion does not serve to overcome the illegal pat-down and the fruits that flowed therefrom. *Nix*, 467 U.S. at 444.[3]

In short, there was close proximity between the illegal pat-down, the statement made by, and the arrest of, Defendant. The Government has failed to point to any intervening circumstances that would purge the taint of the initial illegality, rendering the statement made by Defendant as a result of the officer's query about the firearm, as well as any information obtained as a result of Defendant's illegal arrest, fruit of the poisonous tree. The Court will therefore grant Defendant's request to suppress the statement that he did not possess a firearms license, the DNA evidence, and the ammunition.

Finally, the Government correctly observes that identity information is not itself suppressible as fruit of an unlawful arrest. *INS v. Lopez-Mendoza,* 468 U.S. 1032, 1040 (1984); (Dkt. No. 46). Therefore, the Court will deny Defendant's request to suppress Defendant's name and identity.[4]

---

[3] Further, the alleged "inevitable discovery" on which the Government relies would also appear to be a fruit of the poisonous tree. Any check of Defendant's firearms license would necessarily flow from the discovery of a weapon on his person. Absent the illegal pat-down of Defendant, officers would not have discovered the weapon or engaged in a firearms license check at the station, rendering any such check a fruit of the poisonous illegal pat-down tree.

[4] Although the search of the vehicle was challenged by Defendant, the resolution of that issue is unnecessary because none of the information that Defendant seeks to suppress was obtained through the search of the vehicle. Accordingly, the Court will not address that issue.

### III.   CONCLUSION

For the reasons stated above, the Court will grant Defendant's Motion to Suppress as to the firearm, ammunition, Defendant's firearms license statement made after the pat-down, and the DNA sample. Defendant's Motion is denied with respect to his name, identity, and statements made by Defendant prior to the pat-down. An appropriate Order accompanies this Memorandum Opinion.

Date: January 11, 2017

_____/s/_____
WILMA A. LEWIS
Chief Judge